UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN ERIC JONES,

                         Plaintiff,                    No. 04-CV-74540-DT

vs.                                                    Hon. Gerald E. Rosen

THE UNITED STATES
POSTAL SERVICE, et al.,

                         Defendant.
_____/

OPINION AND ORDER REGARDING
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on ____November 9, 2006_____

PRESENT:   Honorable Gerald E. Rosen
                      United States District Judge

## I. INTRODUCTION

This hybrid Section 301 breach of contract/breach of duty of fair representation claim is presently before the Court on the Motions for Summary Judgment filed by Plaintiff's employer, Defendant United States Postal Service, and Plaintiff's union, Defendant American Postal Workers Union, AFL-CIO (the "APWU"). Plaintiff has responded to these Motions and Defendants have replied. Having reviewed and considered the parties' various briefs and supporting evidence, the Court has determined that oral argument is not necessary. Therefore, pursuant to Eastern District of Michigan

Local Rule 7.1(e)(2), this matter will be decided on the briefs. This Opinion and Order sets forth the Court's ruling.

## II. PERTINENT FACTS

Plaintiff John Eric Jones is a United States Postal Service employee. Jones began his employment with the Postal Service in August 1987, as a part-time flexible ("PTF") clerk at the Saline, Michigan Post Office. He became a full-time regular ("FTR") clerk in 1993 and remained employed in that capacity at the Saline Post Office through September 2001.

Plaintiff's Transfer from the Saline Post Office to the Allen Park Bulk Mail Center

In June 2001, Dorothy Collins, the Postmaster at the Saline Post Office, announced that the Bulk Mail Center ("BMC") in Allen Park, Michigan was accepting applications for maintenance mechanic positions. Shortly thereafter, Plaintiff attended an open house at the BMC in order to learn more about the position. During his visit, Plaintiff was given a tour of the facility by Bob Shirlin, a maintenance supervisor. After taking the tour, Plaintiff decided to obtain the necessary training to qualify for a maintenance mechanic position. He thereafter enrolled in a six-week training class at Wayne County Community College and took the in-service examination.

In August 2001, Jones' name was placed on a register of qualified people for open maintenance mechanic positions. On August 31, 2001, Jones received an interview notice from the Postal Service. The notice stated that it was not an offer of employment and Plaintiff was, accordingly, advised that he should not resign from his position at that

2

time.  The interview notice also contained a "Declination Statement" for Jones to complete if he wanted to decline a maintenance mechanic appointment.[1]  Plaintiff did not decline the appointment; instead, he marked the box requesting that his name be retained on the register for "Career [Maintenance Mechanic] Appointments," signed it, and returned it to the Postal Service together with his completed application for the maintenance mechanic position at the BMC, indicating on his application that he was available "right away."  *See* Postal Service Ex. 2.

---

[1]  The Declination Statement portion of the notice provided as follows:

☐   I am not available for the above appointment.  My future availability and reason for declining are shown below.

☐   Remove my name from the register until I notify your office that I am available.

☐   Retain my name on the register for the types of appointments checked below.  (If you do not indicate your availability for any type of appointment, your name will be removed from the list of eligibles.  Your name will be restored to the register upon receipt of your written request if the register is still in use and your eligibility is current.)

    ☐ Career Appointments    ☐ I will be available after_____
    ☐ Temporary Appointments    ☐ Other (Specify): _____

My Reason for Not Being Available for This Appointment is:

_____

Home Address (If changed)          Signature         Date

_____

[Postal Service Ex. 5.]

Jones was interviewed for the position by Bob Shirlin, the same maintenance supervisor who had previously given Jones a tour of the BMC facility, on September 6, 2001.  During the course of the interview, Jones was shown a copy of the maintenance mechanic job description and asked substantive questions about his abilities to perform certain maintenance tasks.

On September 13, 2001, Saline Postmaster Dorothy Collins, was notified by Linda Stokes, a Human Resources Department employee, that Plaintiff had been selected to be a Level 5 Maintenance Mechanic at the BMC and that the Postal Service was requesting an effective date of September 22, 2001 for Plaintiff's transfer.  *See* Postal Service Ex. 7. Ms. Stokes further indicated that Plaintiff was to report to the Main Post Office in Detroit for orientation on September 24, 2001.  *Id.*  Ms. Stokes also advised Ms. Collins that a Form 50 would be mailed to Plaintiff.  *Id.*   (A "Form 50" is the form used by the Postal Service when an employee transfers positions within the Postal Service to effectuate his transfer to the BMC.)  Ms. Collins, in turn, informed Plaintiff that he was awarded the BMC Maintenance Mechanic position and gave him a copy of the email message from Ms. Stokes for his records.

Jones signed the Form 50 upon receiving it.  Then, on September 24, 2001, Jones and three other transferred employees reported for duty, and as scheduled, attended a two-day orientation at the Main Post Office in Detroit.  During the orientation, Plaintiff reviewed the job description, received information about employee benefits, read maintenance books, and filled out "a lot of paperwork." [Plaintiff's Dep., pp. 17-18; 24-

4

25.] Plaintiff was also told during his orientation period that information regarding his work schedule and job assignment would be provided to him at the BMC.  *Id.* p. 19.

On September 26, 2001, Plaintiff reported to the BMC along with the three other postal employees who had been selected for the maintenance mechanics positions.  BMC Supervisor, Pat Byrnes, informed Plaintiff  that he had been assigned to the afternoon shift with either Tuesdays and Wednesdays, or Wednesdays and Thursdays as his days off.  Supervisor Byrnes also told Plaintiff and the other new maintenance mechanics that the two transferees with the highest seniority would be designated "full-time regulars" and the other two would be designated "unassigned regulars."  (The "unassigned regular" position is a full-time position with a guaranteed minimum 40 hours with two days off per week.  The only difference from a "full-time regular" position is that while the hours are set for unassigned regulars, the employee's duties might vary based on the needs of the Postal Service.)  Jones was not one of the two transferred employees with the highest seniority and was, therefore, designated as an "unassigned regular."

After Supervisor Byrnes finished the meeting, Plaintiff and the other three transferees spent the remainder of their work day signing papers and taking a tour of the BMC.  Jones admitted in his deposition that he did not at any time during the meeting with Byrnes or during the tour of the BMC facility express that he did not want the position.

However, the next day, September 27, 2001, Plaintiff met with Supervisor Byrnes and Rod Collins, a union representative.  Plaintiff told Byrnes and Collins that he decided

5

he did not want the BMC position because he did not like his work schedule and that he

wanted to return to his old clerk's position at the Saline Post Office.  Plaintiff explained

that his daughter was living with him and he "didn't let her have that much time to

herself." [Plaintiff's Dep., pp. 125-126.]  Plaintiff was advised to notify Human

Resources of his request so that the Postal Service could begin the paperwork to transfer

his payroll back to the Saline Post Office.  He was further advised that he needed to put

his request to return to Saline in writing.

The next day, Jones called Leonard Brown, Manager of Human Resources at the

BMC, who told Jones that he would have to stay at the BMC until the transfer paperwork

was processed.[2]  Jones, however, did not immediately put his request for re-assignment in

writing; it was not until October 11, 2001 that he hand-delivered a letter to the Human

Resources Office.  Jones' letter stated as follows:

> Mrs. Stokes[,] my name is John E. Jones ss# - - - -, I'm writing you in the
> personnel department in regards to my retreat rights.  On 9/22/01 I was
> reassigned form [sic; from] Saline Post Office to the BMC in Allen Park.
> On 9/27/01 I had a meeting with my union steward Rod Collins and
> supervisor Pat Burns [sic] on the issue of me returning to my old office.
> They both agreed that it would be ok but I would have to put it in writing,
> so here is my request.  You may contact either of them at the Allen Park
> BMC to let them know which steps to take next.
>
> Thank you [signed] John E. Jones

[Postal Service Ex. 8.]

---

[2]  According to Plaintiff, he was told that this would take two weeks.  However,
the paperwork processing took much longer and Plaintiff stayed at the BMC for ten
weeks before he was transferred back to Saline.

6

Then, on October 29, 2001, Plaintiff faxed the following letter to BMC Human Resources Manager Leonard Brown requesting reassignment to Saline because he had a fear of heights:

> Mr. Brown[,] my name is John Eric Jones SS# - - - - I am the person you and Chuck Turner had the discussion about. Do [sic; Due] to my fear of heights I would be unable to perform my duties in the maintenance department at the BMC in Allen Park. Therefore I'm requesting to be reassigned to my vacated position in the Saline Post Office.
>
> Thank You
> John Eric Jones

[Postal Service Ex. 9.]

On November 28, 2001, Jones was informed that his transfer request back to the Saline Post Office was being granted. However, Jones was also informed at that time that he was being assigned to the Saline Post Office as a part-time flexible ("PTF") clerk and that he had lost his accrued facility craft seniority. Jones lost his accrued seniority at the Saline Post Office (thereby depriving him of the right to return to his previous full-time regular ("FTR") clerk position) because he voluntarily transferred to the BMC from the Saline Post Office and from the Clerk Craft to the Maintenance Craft. [Deposition of Richard Blake, Union Ex. B, p. 39.]

Article 37.2.D.6 of the Collective Bargaining Agreement between the APWU and the U.S. Postal Service (the "CBA"), which applies to Postal Service employees in the Clerk Craft, provides as follows:

**6. Changes in Which Seniority is Lost**

7

Except as specifically provided elsewhere in this Agreement, a full-time
employee or a part-time regular employee begins a new period of seniority:

a.  When the change is:

(1) from one postal installation to another at the
employee's request.

(2) from another craft to the Clerk Craft
(voluntarily or involuntarily).

[*See* Union Ex. C, Declaration of Terry Stapleton, Decl. Ex. 5.][3]

Plaintiff's Grievance

On December 1, 2001, Plaintiff reported back to the Saline Post Office.  That day,

he contacted Richard Blake, a steward for the Michigan Postal Workers Union (the

"MPWU") whose jurisdiction includes the Saline Post Office.  Jones told Blake that he

felt that because he never "accepted" the maintenance mechanic position at the BMC, he

should have been able to return to his old FTR clerk's position at the Saline Post Office

with all of his seniority rights intact.  Blake told Jones that he would look into the matter

and that he would set up a meeting with Postmaster Collins.  Jones, however, did not

initiate a Step 1 grievance challenging his reassignment to PTF and loss of seniority.  Step

1 of the grievance procedure in the CBA provides, in relevant part, as follows:

─────────────────

[3] Article 38.3.E.1, which applies to Postal Service employees in the Maintenance
Craft, similarly states, "Employees who change from one craft to another shall begin a
new period of seniority for preferred assignment. [Ex. 4 to Stapleton Declaration at Union
Ex. C.]  *See also* Article 38.3.E.2 ("Change from one postal installation to another. . .
will require the start of a new period of seniority for preferred assignment." *Id.*)

> Any employee who feels aggrieved must discuss the grievance with the
> employee's immediate supervisor within fourteen (14) days of the date on
> which the employee or the Union first learned of its cause. The employee,
> if he or she so desires, may be accompanied and represented by the
> employee's steward or a Union representative. The Union also may initiate
> a grievance at Step 1 within 14 days of the date the Union first became
> aware of (or reasonably should have become aware of) the facts giving rise
> to the grievance. In such case, the participation of an individual grievant is
> not required.

[*See* Union Ex. C, Stapleton Decl. Ex. 3.]

On December 5, 2001, Plaintiff and Blake met with Postmaster Collins. At this
time, Blake gave Postmaster Collins a "Request for Information & Documents Relative to
Processing a Grievance." Blake told Plaintiff that he would get back to him after he
received the requested paperwork from management.

Approximately a week later, Plaintiff called Blake to find out the status of his
situation. Blake told Plaintiff that he still had not received the paperwork from
management and, therefore, he had no new information regarding Jones' transfer.

Meanwhile, Plaintiff contacted the Postal Service directly to complain about his
PTF status. On December 19, 2001, Lee Ward, Manager of Personnel Services, advised
Plaintiff that his reassignment to the Saline Post Office as a PTF clerk was in accordance
with Article 37, section 6 of the CBA. Obviously not happy with what Ward told him, on
December 30, 2001, Plaintiff wrote to Detroit District Manager John Talick attempting to
obtain a different result. *See* Postal Service Ex. 11. Talick, however, informed Plaintiff
by letter on February 8, 2002 that his return to the Saline Post Office had been handled
properly under the CBA. *See* Postal Service Ex. 12.

Meanwhile, Richard Blake, the MPWU steward, continued his investigation into the matter. Blake's initial reaction to Mr. Jones' situation was that it was a "pretty bizarre set of circumstances." [Blake Dep., pp. 56, 62-63]. He "felt that in order to substantiate what Mr. Jones was asserting" -- i.e., that he never actually transferred from his FTR Saline Post Office position to the BMC maintenance mechanic position such that he should not have lost his seniority upon returning to Saline -- he "had an enormous burden to overcome." *Id.* at p. 56.

To ascertain the correctness of Jones' contention, Blake made "numerous requests" to obtain Jones' Form 50, which contained information regarding his reassignment as a PTF. *Id.* at 13-14. In addition, Blake made several phone calls to local and district managers concerning Jones' situation. *Id.* at 17, 57. It was not until Jones showed him the February 8, 2002 letter from John Talick that Blake had evidence confirming that the Postal Service had, in fact, reassigned Jones to a PTF position. *Id.* at p. 54. After reading this letter, Blake concluded that Plaintiff's situation could not be resolved without resorting to the grievance process. *Id.* at p. 55. Blake started "brainstorming" and "virtually immediately" filed a Step 1 grievance. At the time Blake filed the grievance, on February 21, 2002, Blake had no reason to believe that it was untimely. *Id.* at 79.

Blake believed that seniority and reassignment issues were ongoing violations that allowed the Union to file a grievance under the CBA during the entire time period that the employee was in the improper classification designation, plus 14 days. *Id.* at 31, 50. He

10

based this belief on having recently handled two other grievances regarding the same issue and "in both of those cases the employer acknowledged that this is deemed an ongoing violation." *Id.* at 31.

The grievance was denied by the Postal Service at Steps 1 and 2. *Id.* at pp. 34-35.[4] Blake believed that Jones' situation had "enough merit that it warranted being pursued and being placed in front of an arbitrator." *Id.* at p. 58. Therefore, he appealed the grievance to arbitration.

An arbitration hearing was held on March 1 and 11, 2004 before Arbitrator Alan Walt. Plaintiff was present at the hearing. Richard Blake testified at the hearing on Plaintiff's behalf. On May 20, 2004, Arbitrator Walt ruled that the grievance was not timely filed at Step 1 and, therefore, was not arbitrable. The Arbitrator found that the grievance should have been filed within 14 days of December 1, 2001, when, upon Plaintiff's return to the Saline Post Office, he became aware that his status had changed from full-time regular to part-time flexible. Arbitrator Walt did not address the merits of the grievance.

Notwithstanding the results of the arbitration, the APWU and the Postal Service continued to discuss Plaintiff's situation. Mr. Blake had numerous discussions with John

---

[4] Under the CBA, chartered locals, area locals, state and regional organizations of the APWU handle grievances at Steps 1 and 2. The National Union, which is the named union defendant in this case, does not begin handling grievances until they have been appealed by the chartered affiliates to Step 3. Thus, the National Union was not involved in anyway with respect to the decision of the Richard Blake or the MPWU as to whether or when to pursue Plaintiff's the grievance.

11

Clark, the senior National Business Agent for the APWU in the Chicago Region regarding the matter in the fall of 2004. Mr. Clark subsequently was able to negotiate a settlement with the Postal Service of Plaintiff's underlying grievance.

Under the terms of the settlement agreement, the Postal Service agreed to disregard the arbitration award and restore Mr. Jones to full-time regular status and give him his in-house seniority back. Accordingly, in December 2004, Jones was returned to his FTR clerk's position and was restored his 14 years of seniority. Pursuant to the Postal Service's agreement with the APWU, however, Plaintiff was not paid any compensation in connection with the settlement. Plaintiff calculates the pay differential that he lost during the nearly three years that he was classified as a PTF clerk to be approximately $35,590.

Meanwhile, on November 19, 2004, Plaintiff initiated this hybrid § 301 breach of contract/breach of duty of fair representation lawsuit. With respect to his DFR claim, Plaintiff alleges that the Union breached its duty of fair representation by failing to timely file his grievance. He also claims that the Postal Service breached the collective bargaining agreement with respect to his assignments, seniority rights and transfers. Discovery has now closed in this matter, and the Postal Service and the Union have both moved for summary judgment.

III. DISCUSSION

A. STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper "'if the pleadings, depositions, answer to

12

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law.'"  Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases -- *Matsushita Electrical Industrial Co. v. Zenith

Radio Corp.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986);

and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) -- ushered in a "new era" in the

standards of review for a summary judgment motion.  These cases, in the aggregate,

lowered the movant's burden on a summary judgment motion.[5]  According to the *Celotex*

Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a party who
> fails to make a showing sufficient to establish the existence of an element essential
> to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322.

After reviewing the above trilogy, the Sixth Circuit established a series of

principles to be applied to motions for summary judgment.  They are summarized as

follows:

> * The movant must meet the initial burden of showing "the absence of a genuine
> issue of material fact" as to an essential element of the non-movant's case.  This
> burden may be met by pointing out to the court that the respondent, having had
> sufficient opportunity for discovery, has no evidence to support an essential

---

[5]"Taken together the three cases signal to the lower courts that summary judgment
can be relied upon more so than in the past to weed out frivolous lawsuits and avoid
wasteful trials."  10A C. Wright, A. Miller, M. Kane, Federal Practice & Procedure, §
2727, at 35 (1996 Supp.).

element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir. 1996). *See also, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). The Court will apply the foregoing standards in deciding Defendants' Motions for Summary Judgment in this case.

B.   THE INTERDEPENDENCY OF BREACH OF CONTRACT/BREACH OF DUTY OF FAIR REPRESENTATION CLAIMS

The body of law established under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, *et seq*. (the "LMRA") applies to hybrid claims involving the Postal Service and labor organizations that represent postal employees.[6] *See Lawson*

---

[6] Hybrid claims alleging breach of contract by the Postal Service and breach of the duty of fair representation by a postal workers' union may properly be brought in federal court under the Postal Reorganization Act, 38 U.S.C. § 1208(b) (the "PRA"). This statute is "an analogue of Section 301(a) of the LMRA." *Lawson v. Truck Drivers, Chauffeurs & Helpers, Local Union 100*, 698 F.2d 250, 254 (6th Cir. 1983). Therefore, courts apply Section 301 case law to Postal Service labor relations cases arising under the PRA. *Id.*

14

*v. Truck Drivers, Chauffeurs & Helpers, Local Union 100*, 698 F.2d 250, 254 (6th Cir. 1983), *cert. denied*, 464 U.S. 814 (1983), and cases cited therein.

The Supreme Court and Sixth Circuit have consistently held that for a plaintiff to succeed on a hybrid breach of contract claim, he must prove <u>both</u> that the union breached its duty of fair representation <u>and</u> that the employer breached the collective bargaining agreement. *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 110 S.Ct. 1339, 1344 (1990); *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 163-65, 103 S.Ct. 2281 (1983); *White v. Anchor Motor Freight, Inc*., 899 F.2d 555 (6th Cir. 1990); *Driver v. United States Postal Service*, 328 F.3d 863, 868 (6th Cir. 2003) ("Liability cannot attach to the Postal Service or the Union unless both prongs of this test are satisfied"); *Lucas v. Leaseway Multi Transportation Service, Inc.*, 738 F.Supp. 214, 220 (E.D.Mich. 1990), *aff'd*, 929 F.2d 701, 1991 U.S. App. LEXIS 6093 (6th Cir. 1991) ("Since plaintiff's count as to the duty of fair representation fails, plaintiff's other count alleging a breach of the CBA also must fail").  Conversely, without a valid claim against the employer, the union could not be challenged because no duty to the employee would have been triggered. *White v. Anchor Motor Freight, supra*, 899 F.2d at 559 ("[I]f the first claim anchored in the employer's alleged breach of the collective bargaining agreement fails, then the breach of duty of fair representation claim against the union must necessarily fail with it").  This interdependency of § 301 claims has been noted and approved by the Sixth Circuit:

In this hybrid suit under § 301 of the Labor Management Relations Act, 29

U.S.C. § 185, to recover against <u>either</u> the Company <u>or</u> the Union, [Plaintiff] must show that the Company breached the Agreement <u>and</u> that the Union breached its duty of fair representation.  **Unless [Plaintiff] demonstrates <u>both</u> violations, he can not succeed against either party.**

*Bagsby v. Lewis Bros., Inc.*, 820 F.2d 799, 801 (6th Cir. 1987)(citation omitted)

(emphasis in original).  *See also Black v. Ryder/P.I.E. Nationwide, Inc.*, 930 F.2d 505,

510 (6th Cir. 1991) ("In any event, when the union cannot be held liable for unfair

representation, of course, the employer cannot be held liable for breach of the collective

bargaining agreement").

C.     PLAINTIFF HAS FAILED TO ESTABLISH THAT THE UNION BREACHED
       ITS DUTY OF FAIR REPRESENTATION

The Supreme Court set the parameters of the duty of fair representation in the

seminal case of *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903 (1967).  As to what is required

to establish a union's breach of its duty, the *Vaca* court stated:

> A breach of the statutory duty of fair representation occurs <u>only</u> when a
> union's conduct toward a member of the collective bargaining agreement is
> arbitrary, discriminatory or in bad faith.

87 S.Ct. at 916 (emphasis added).

In *Air Line Pilots Association, International v. O'Neill*, 499 U.S. 65, 111 S.Ct.

1127 (1991), the Court further delineated what would constitute "arbitrariness" under the

*Vaca* standard:

> We further hold that <u>a union's actions are arbitrary only if, in light of the factual
> and legal landscape at the time of the union's actions, the union's behavior is **so
> far outside a "wide range of reasonableness" as to be irrational**</u>.

*O'Neill*, 111 S.Ct. at 1130 (emphasis added) (citation omitted).

This standard "gives the union room to make discretionary decisions and choices,

even if those judgments are ultimately wrong." *Marquez v. Screen Actors Guild*, 525

U.S. 33, 45-46 (1998).  Therefore, merely characterizing a union's conduct as "arbitrary",

"perfunctory" or demonstrative of "bad faith" is insufficient to withstand summary

judgment.  Rather, to meet his burden of proof as to the union's breach of its duty of fair

representation, a plaintiff must establish by <u>substantial evidence</u> that the union acted

arbitrarily, discriminatorily or with bad faith.  *Motor Coach Employees v. Lockridge*, 403

17

U.S. 274, 299 (1971); *Ratkosky v. United Transportation Union*, 843 F.2d 869 (6th Cir. 1988) (summary judgment granted where plaintiff fails to make a showing of bad faith, discrimination or arbitrary conduct). "Simple negligence or mere errors of in judgment will not suffice." *Walk v. P*I*E Nationwide, Inc.,* 958 F.2d 1323, 1326 (6th Cir. 1992). As the court explained in *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573 (6th Cir. 1994), "The 'relevant issue in assessing a Union's judgment is not whether it acted incorrectly, but whether it acted in bad faith,' or extremely arbitrarily, or discriminatorily." *Id.* at 584 (citation omitted).

Thus, "[u]nion action that can be rationally explained does not violate a duty of fair representation." *Bruno v. United Steelworkers of America*, 983 F.2d 1065, 1993 WL 2300 at *3 (6th Cir. 1993) (unpublished decision; text available on WESTLAW); *see also Ruzicka v. General Motors Corp.*, 649 F.2d 1207 (6th Cir. 1981) (holding that reasoned conduct does not violate the union's duty of fair representation).

In this case, Plaintiff's DFR claim is based upon his contention that his union representative, Richard Blake, failed to timely file a grievance protesting his assignment to a PTF position upon his return to the Saline Post Office. Blake explained in his deposition the reasons for his decision not to immediately pursue the grievance upon Jones' informing him of the reassignment and instead to wait until he received confirmation of the action from the Postal Service. Blake testified that his initial reaction to Jones' presentation of his situation was that although Plaintiff's version presented a "pretty bizarre set of circumstances," he did not have "any evidence that

18

corroborated [Plaintiff's] version of the events."  Blake Dep., pp. 56, 62-63.  Blake did

not want to pursue a difficult grievance without confirmation that there was actually a

violation of the National Agreement.  *Id.* at 62-63.  Blake testified that he needed to

investigate what Plaintiff was alleging and if his reassignment and loss of seniority were

potential breaches of the contract.  *Id.*

Blake further testified that if there were breaches of the CBA, he viewed them as

ongoing violations that would allow the union to file a grievance during the entire period

that the employee was in the improper classification designation, plus 14 days thereafter.[7]

*Id.*  He based this belief on his prior handling of two other grievances involving similar

issues of reassignment and loss of seniority where, in both cases, the Postal Service

acknowledged that the contract violation was an ongoing one.  *Id.*

A similar situation existed in *Ruzicka v. General Motors Corp., supra*.  As in this

case, in *Ruzicka*, the union failed to timely file a grievance statement with the employer

and was subsequently sued by the grievant for breach of the duty of fair representation.

The union defended with evidence that it relied on a past practice of the employer of

ignoring the deadline for the filing of grievance statements where the union needed more

time to investigate the matter.  The Sixth Circuit held that where the bargaining

---

[7]  The Sixth Circuit recognizes the "continuing violation" concept in the labor
arena.  *See D.E.I., Inc. v. Ohio and Vicinity Regional Council of Carpenters*, 155 Fed.
Appx. 164, 172 (6th Cir. 2005).  *See also, Monee Nursery & Landscaping Co. v. Int'l
Union of Operating Engineers, Local 150*, 348 F.3d 671, 676 n. 2 (7th Cir. 2003) (one
permissible definition of the continuing violation theory is the "common understanding"
of the words, that is, that a violation of the collective bargaining agreement was ongoing.)

representative's failure to timely file the grievance statement was due to reliance on a past

practice, the union would be relieved from liability.  The court explained:

> In relying on a past practice, a union's omission is based on a wholly
> relevant consideration, is not intended to harm its member, and is not the
> type of arbitrariness which reflects reckless disregard for the rights of the
> individual employee.  Such conduct, at times, manifests no more than
> ordinary negligence and we cannot hold a union liable for breach of the
> duty of fair representation based upon simple negligence.  The law in this
> circuit proscribes that result.  In *Dill v. Greyhound Corp.*, 435 F.2d 231,
> 238 (6th Cir. 1970), *cert. denied*, 402 U.S. 952, 91 S.Ct. 1622, 29 L.Ed.2d
> 122 (1971) we held that bad faith was required to support a claim of unfair
> representation where the union had made a decision that the individual's
> grievance was without merit. *See also Whitten v. Anchor Motor Freight*,
> *Inc.*, 521 F.2d 1335, 1341 (6th Cir. 1975), *cert. denied*, 425 U.S. 981, 96
> S.Ct. 2188, 48 L.Ed.2d 807 (1976); *Balowski v. International U., United A.*
> *A. & A. Imp. Wkrs.*, 372 F.2d 829 (6th Cir. 1967). Admittedly, in those
> cases the merits of the employee's grievance had, in fact, been evaluated
> and decided adversely to the employee by the unions which chose not to
> pursue the grievances. In the present case the union inaction served to
> terminate the grievance. Yet, we see no reason to apply a stricter standard to
> a union's filing of a statement based on past practice than is applied to a
> union's decision not to pursue a grievance that it believes to be without
> merit.  In both cases, the union can articulate a sufficient legal rationale to
> justify the manner in which the grievance has been handled.  Whatever the
> rationale, the standard against which it is judged should be uniform.  A
> contrary conclusion would inject the courts into the process of second-
> guessing a union representative's decisions and would undermine a union's
> ability to rely on prevailing practices.

649 F.2d at 1212.

Here, as in *Ruzicka*, the union has offered an arguably sound reason for its decision

not to immediately file the grievance.  Relying on his good faith understanding of the past

practice with respect to issues of reassignment and loss of seniority and waiting for a

response to his information request, Mr. Blake believed that the issue raised by Mr. Jones

-- if indeed it turned out to be a contract breach -- would be a continuing violation that could be handled in a similar manner to two other grievances that he had recently handled with the Postal Service after he completed his investigation into the matter and confirmed Plaintiff's allegations.

Under these circumstances, and by application of the authorities cited above, Plaintiff cannot make out a legally cognizable claim against the union for breach of the duty of fair representation. Therefore, his hybrid claim must be dismissed not only as against the APWU, but also as against the Postal Service.

D.     THERE WAS NO BREACH OF CONTRACT

Even assuming *arguendo* that Plaintiff could make out a DFR claim against his union, both Defendants are still entitled to summary judgment on Plaintiff's hybrid Section 301 claim because Plaintiff cannot establish a breach of the collective bargaining agreement.

The contract language in Article 37, Section 2.D.6, clearly states that a postal employee loses seniority by requesting to move from one postal installation to another. There is no dispute that Plaintiff here requested a transfer from the Saline Post Office to the Bulk Mail Center and from the Clerk Craft to the Maintenance Craft. He filled out a transfer form, got the transfer approved and went to work at the BMC. The fact that Mr. Jones did not like the hours he was assigned at the BMC did not operate to nullify his voluntary transfer. Mr. Jones' subjective interpretation of the CBA -- that he never "accepted" the transfer because he immediately requested a transfer back to the Saline

21

Post Office and that as a consequence, he was not subject to the loss of seniority provisions in the Agreement when he transferred back to Saline -- is irrelevant since he was not a party to the Agreement.  And, Plaintiff has not cited any contractual language in support of his position that he was entitled to keep his seniority under the circumstances of this case.

When determining whether the employer breached a collective bargaining agreement, courts are required to look to the "plain meaning of the agreement." *Roeder v. American Postal Workers Union*, 180 F.3d 733, 737 (6th Cir. 1998).  The seniority provision in the CBA in this case is clear and unambiguous.  Article 37, Section 2.D.6 states, in pertinent part:

**6.  Changes in Which Seniority is Lost**

Except as specifically provided elsewhere in this Agreement, a full-time employee or a part-time regular employee begins a new period of seniority:

A.  When the change is:

    (1) from one postal installation to another at the employer's request.

    (2) from another craft to the Clerk Craft (voluntarily or involuntarily).

The Postal Service acted entirely in accordance with this provision when it classified Plaintiff as a part-time flexible employee upon his transfer back to the Saline Post Office, and, therefore, followed rather than breached, the Collective Bargaining

22

Agreement.[8]

CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that the Motions for Summary Judgment filed by (1) Defendant American Postal Workers Union, AFL-CIO and (2) Defendant United States Postal Service be, and hereby are GRANTED.  Accordingly,

IT IS FURTHER ORDERED that this case be, and hereby is, DISMISSED, with prejudice.


s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

Dated:  November 9, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 9, 2006, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager

---

[8]  The Court further notes that Plaintiff received substantially all of the relief he is entitled to under the CBA by way of the post-arbitration settlement agreement with the Postal Service negotiated by his union: He has been returned to his FTR classification and all of his accrued seniority has been restored.